Madam Chief Justice, members of the Court, good morning. My name is Jeff Silverstein and I'm CJA counsel up in Bangor, Maine. I'm pleased to appear before you today representing now 25-year-old Mark Razo. He was approximately 19 when he was sentenced to a two-year period of incarceration in the state of California. California has apparently a very difficult problem with smuggling of cell phones in prison and he was able to get hold of some contraband cell phones while he was incarcerated. In connection therewith, he made numerous phone calls to an associate, Barry Diaz, whom he understood lived in Connecticut and had a Connecticut telephone number. Ultimately, the evidence would reveal they conspired to distribute several different drugs in various places in the country. This case is about the prosecution and sentencing on part of that conspiracy which involved shipments of methamphetamine from California to Iowa involving Mr. Diaz and some others. Before I get to my central issues which involve the testimony elicited at trial regarding the purity of the methamphetamine and some of the sentencing decisions that were made in regards thereto, I just want to take a bold move and speak to the overall context of this case. Mr. Razo was being released from that state sentence in California and upon his crossing essentially of the threshold door at the prison, he was met by a Maine drug enforcement agent. He was placed under arrest and ultimately brought to Maine to face these conspiracy charges. He has no ties to Maine. He's never been to Maine. And the evidence disclosed that the largest portion of the conspiracy involved these drug issues, if you will, shipments, which related from California to Iowa and California to Arizona. But the venue question was put to the jury, wasn't it? It was put to the jury on the issue of venue, Your Honor. And I guess the point I want to just raise before you is we understand that the court and the law provides for certain, how shall I say, categorical approaches, not categorical in the term of art, but just certain limited approaches to challenging venue. And we understand that the law permits that in a conspiracy, that venue can be placed in any location in the overt act of the conspiracy. And I don't deny that the government has established that Mr. Razo made calls to Mr. Diaz when Mr. Diaz was located in Maine. And that may have very well been enough. But I think the overall context of this case is such that it flipped the guideline and sentencing analysis around. And instead of us having a situation where Mr. Razo was sentenced relative to acts occurring in Maine, which may have been, how shall I say, affected for sentencing by relevant conduct thereto, what the government did here was they flipped it around and brought him to Maine for the relevant conduct associated with that. And that's not a matter of Iowa, California matter. There's really nothing in the record which substantiates any ties in this conspiracy in any significant way to Maine. Instead, he was sentenced for conduct that occurred out West in Maine. And as you might imagine, a Maine judge, with all due respect to our judges in Maine and here in Boston as well, Your Honors, are not in tune to the issues that Mark Razo would have faced had he been sentenced out in the Midwest. Or the West, where those judges were more in tune to the types of individual he was coming from inner city Los Angeles ghetto and the types of drug problems that were inherent in Iowa. So with that backdrop, I do want to address my substantive points. And the first concerns the eliciting of testimony regarding the purity of the methamphetamine. And the government called an Iowa chemist to substantiate and provide testimony related to the charge that they brought, which included the aggravating element of a conspiracy involving 50 grams or more of actual methamphetamine or 500 grams or more of a substance containing methamphetamine. And the chemist came in and she testified that she performed actual analysis of the drugs and concluded that they were methamphetamine. And we make no issue with that. She went on, however, to speak of her purity testing and what was revealed in the context of the examination was that what she did was she took a sample that was represented to be 100% pure and tested it against the suspect sample or the sample seized from the fruits of the investigation of this conspiracy and made a determination as to the purity in that regard. And it's our contention that her reliance upon this so-called known standard without having undergone any testing of her own was in contravention of my client's Confrontation Clause rights. Now, the recent case of Williams v. Illinois by the Supreme Court indicated that in certain circumstances, the Confrontation Clause will allow an expert to rely upon that type of information which an expert traditionally relies upon, which may include factual assertions by others, including other experts. This Court has not yet spoken in any substance on the significance or scope of this Williams case. It only did so in the Soto case, which was published recently. And that case involved a DNA report, Your Honor. I'm sorry, the vouching of the, it involved an expert who had a DNA sample of a certain substance. Reviewed the findings of another expert, but then undertook his own analysis and then testified, well, I read the expert's report. My findings are consistent with his report. So it's a slightly different factual context than this presented here. And my argument, Judge, relies upon the fact that the chemist here worked for the state lab. The state's lab's job was to test, not only to determine the substance, but also the purity for prosecution purposes. So in reliance upon the statement by the chemical company which provided the known sample that this was 100 percent pure, it should be said that it would have been expected that that statement would have been made for and available for use later at trial. And therefore, would constitute the type of testimonial statement that would be guarded under the Confrontation Clause analysis. So we think this case presents a healthy opportunity for this Court to address Williams in this context and offer the defendants some relief on that regard. Can I ask a record-based question? Please. The judge referred to Ms. Johnson as an expert. But was she noticed as an expert? Was there voir dire? Was she qualified as an expert? Do you know? Was there any dispute about that? There is not. She was noticed properly by the government. We understood her to come in in that capacity. With the presentation of her credentials, I didn't challenge them because it was apparent that she qualified under the rules. And I understand that that implicates the Williams concerns, but I think what was addressed in Williams and what's addressed here are slightly different. Insofar as in Williams, there was a known DNA sample tested against an unknown sample for comparative purposes, but there were no assertions about the identity of the known sample, so to speak. In other words, the expert in that case did not say, well, I believe this to have come from the defendant, and therefore the expert engaging in the analysis kind of already had half of the story supplied and just needed to supply the remainder. How do you respond to the argument that the Sigma sample that's declared to be 100 percent pure is not itself testimonial because it's not in anticipation of any specific investigation? Well, again, while it may not have been in anticipation of a specific investigation, its use was predominantly for the purposes of prosecution and presentation. Isn't that true in the Williams context as well, though? But in the Williams context, there wasn't a statement, as I just indicated. I think there's a distinguishing fact insofar as in the Williams, the initial sample was provided. And what was significantly at issue in Williams was the report notations that said, well, these were obtained from the victim's vaginal swab. And this presents a slightly different context in the case that the expert was told, this is purity because we tell you it is. And therefore, she came in and said, well, all I can tell you is this measured up against what someone else told me is the chemical attributes of the sample. Was the known standard report, is there a report that was entered into evidence? Or is it all we have is just her testimony about that report? All we have is her testimony. And what's the significance of that? Does that help you or hurt you? Well, I think it takes it out of the context of Bulkhoming and Melendez-Diaz, in which case in those circumstances, they were more characteristic of the type of evidence that has been deemed testimonial by the Supreme Court. But in this case, we don't think it's significantly different because herein we suggest that it was for the purposes of prosecution. Can I just ask about harmless error? I mean, she testified to her testimony regarding it being methamphetamine. Right. And she testified to the weight of that evidence. And she testified to well in excess of 500 grams. So why do we have to worry about the Williams issue since there is, I think, a higher guideline in sentencing because the court relied upon the purity testimony for the purposes of applying the higher guideline range? But on that point, I guess there's two aspects. There's a question of the sentence. But, of course, a judge can rely on evidence in a sentence without implicating Crawford, right? You don't get the same rights as to what evidence the judge can rely on. There you don't have a confrontation right as to all evidence the judge can rely on in sentencing. There's a separate question as to what was the conviction and the element there which Crawford clearly applied to. So I guess I'm trying to figure out why. Well, I guess it would be my argument that the judge should respect a properly rendered verdict and that although there may have been an aggravating factor, that the judge should not rely upon unconstitutional testimony in order to render his guideline determinations. Thank you. That addresses your question. Might be easier just to deal with Crawford. Ms. McGoey. I'm Margaret McGoey for the United States. If I may focus on the confrontation issue. I think Judge Barron has correctly pointed out there are two aspects of the purity of the drug. One relates to the conviction and the other relates to the sentence. With respect to the conviction, the government established the purity of the drug by virtue of presenting in live form the chemist who actually performed the analysis of the drug. She was subjected to thorough cross-examination. In the government's view, that is what Crawford and the entire line of cases requires. The Williams case has made clear that even if there is inadmissible hearsay that is used as the basis of an expert's opinion, as long as the expert who performs the analysis testifies in court, that satisfies the confrontation clause. And one of the questions the government has is who else was there to confront? The sample was not a statement. The sample was not a live human being who could be subjected to cross-examination. The reference library was not a statement. The reference library was not a live human being who could be subjected to cross-examination. A live human being testified that that known standard was 100% pure. Without that evidence, he can't be convicted. There is someone who has to have that conclusion who is a human being, right? Let me diverge you, Judge Barron. It is not correct that he could not be convicted because the jury verdict form put to the jury the question of whether it was 500 grams of pure methamphetamine. That's the conclusion that even if there was a Crawford error, it was harmless. Correct. And that's just on the conviction. Let's just stick with the Williams point and the Crawford point for a moment, because I want to come back to whether even if the conviction was harmless, is there any lingering Crawford error that would still play out in the sentence, or is it your position that once you say that the conviction is harmless, and then you're in the sentencing realm, you don't have to worry about whether there was a Crawford violation anymore? If I may answer your second question first, the answer to that is it's harmless for two reasons. One is, well, three reasons. One is that this defendant was a career offender, and the sentence he received was within the career offender range. The second is that if it were pure methamphetamine, he had a base offense level of 42, which had a guideline range of 360 months to life. Even if it was a substance containing methamphetamine, he was at base offense level, or excuse me, total offense level 38, which was in excess of the career offender adjudication and still put him within. So it's your position that any Crawford violation, if there was one, is irrelevant to the outcome of this case because it's all harmless all the way through. Correct. And getting back to the conviction itself, even if the chemist had not testified about the purity of the drug, there was a series of recorded conversations in which the defendant himself made reference to Duran taking drugs to Iowa that had to be straight so that they could make a profit. The agent testified that straight meant pure. There was a discussion between Razzo and Diaz about the need to cut the methamphetamine so that they could make a greater profit. There was even a discussion about cutting one pound into 20 or 22 ounces. So even if the chemist had never testified, the jury had ample basis for believing that this was pure methamphetamine. Or that Razzo thought it was pure. Well, and if that had been the defendant's argument that Razzo thought he was sending pure methamphetamine and it wasn't, that was never an argument that was made to the jury. The assumption was the Crawford violation, which the judge overruled and the government believes in with good reason. There's this court's 2011 Ramos-Gonzalez case, which stands for the proposition that when an expert relies on that expert's own training and expertise to reach an independent conclusion, that expert testimony is admissible against a Sixth Amendment violation, even if it relies on an admissible hearsay. So the combination of Williams and Ramos-Gonzalez in the government's view supports the district court's ruling that there was no confrontation error here because the defendant fully cross-examined the woman who personally performed the test. And he never asked for anyone to... But he was able to cross-examine her on the performance of the test. Correct. But she then testified that what she concluded or what she found was that it was 100% pure. Correct. But she can't know whether it's 100% pure. That's his objection. Well, we have to start from somewhere, Judge Barron. Which I assume the defendant agrees with, which is why he'd like to start with the person who knows whether it's actually pure so he could cross-examine that person. And I suppose in theory the defendant's line of analysis could go, I want to cross-examine the person from Sigma Chemical who made this drug. I want to know where that chemist got his specifications for manufacturing the drug. But that's Justice Breyer's concurrence in Williams, I think. And it's only a concurrence, which makes me wonder what the others think. Well, and Williams was a 4-4 opinion, and I understand that, Judge Howard. But the argument that you're making now, I could only see one justice who made that argument. Well, I have three judges ahead of me here. And I think Ramos, I ought to know this, but I don't. I think Ramos, was it Gonzales? Gonzales, correct, 2011. Preceded Williams? It did. Yeah. So I don't know about whether our statement in that case holds up after Williams. I don't know. Well, the other point, Judge Barron, is that there was nothing in the record to suggest that this was anything other than pure methamphetamine. There was no evidence that there had been a dilution of it, that Sigma chemical had been reported in the news for manufacturing talcum powder. That's a harmless error point? That's part of the confrontation, that if the defendant is claiming there is a right to confront, in the government's view, there has to be some reason to go behind all of that. But I will take it as harmless error. I will take it as harmless error, because in this case – Can I just ask you on the harmless error point, just so I'm clear? Is there a case that makes clear that when you've got a situation like this where there's one part of the statute which you're being convicted under that is for quantity and one for purity, that if there is an error on the evidence with respect to purity, we can say it's harmless if we find sufficient evidence of quantity, even though the jury made no finding on that point? Are you referring to the sentencing error? Well, I'm trying to understand the error on the conviction. What is the conviction of? The conviction is for a conspiracy involving 50 grams of methamphetamine. And that's 50 grams pure? Correct. Okay. So what I had thought the government was saying is, but it's also possible to convict, though the jury never made a finding on this point, for 500 grams of a substance containing methamphetamine. Correct. And the sentence would have been the same. And the sentence would have been the same. Correct. So I guess what I'm asking is, is it possible to say that the error, if there was error in the conviction with respect to purity, can be rendered harmless by evidence of a different part of the statute, a conviction for quantity? I am not aware of any case authority that stands for that proposition, but I don't see why not. I would be happy to answer. One reason why not, maybe, is it's a different conviction. So it can't render the conviction for the first thing harmless. Except that the indictment charged both drugs. It charged both the pure form and the substance-containing form. And that question was specifically submitted to the jury. I understand your concern with that. But even if this had not been pure methamphetamine, the jury could have convicted for a substance-containing methamphetamine, which logically they would have done even if they had not been persuaded it was pure. They believed it was methamphetamine, and there was ample evidence that it was methamphetamine. The defendant never objected that it was methamphetamine. The question was the purity of it. So in the government's view, there was no error, but even if it was error, it was harmless for the reasons that I've identified, both the other evidence of the purity of the drug and that it had no impact on sentencing. Okay. Thank you very much. Thank you.